C. A. Happold v. Commissioner.
Happold v. Commissioner
Docket Nos. 106124, 109132.
United States Tax Court
1942 Tax Ct. Memo LEXIS 63; 1 T.C.M. (CCH) 163; T.C.M. (RIA) 42625; December 1, 1942
*63 Harry C. Weeks, Esq., 911 Sinclair Bldg., Fort Worth, Tex., for the petitioner. Wilford H. Payne, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, J.: These consolidated proceedings challenge respondent's determination of income tax deficiencies in the amounts of $1,475.36, $1,453.08, $1,360.36 and $26,229.78 for the years 1936, 1937, 1938, and 1939, respectively. In issue is whether petitioner realized a taxable capital gain on a formal oil and gas lease assignment on May 18, 1939, which issue must be decided by a determination of the character of petitioner's interests in the oil and gas leases. That determination will settle the additional questions of whether petitioner is entitled to depletion, and whether income from the oil and gas interest was separate or community property of petitioner for the years 1936, 1937, 1938, and 1939. There is another question of whether petitioner is entitled to depreciation. The parties have agreed that respondent's valuation of the properties on May 18, 1939, was excessive by 15 per cent and that the correct valuation is $144,322.25. The parties have stipulated further that should the Board hold the 1939 assignment *64 to be taxable petitioner is entitled to an increased depreciation allowance for the remainder of 1939 in the amount of $480.55. Findings of Fact Petitioner in 1929 moved to Texas where he married Edna Happold on March 3, 1932. They lived together until June 26, 1937, when they were divorced, and on December 22, 1937, petitioner married Adele J. Happold, and has lived with her until the present time. Petitioner's income tax returns for the periods in question were filed with the collector of internal revenue for Dallas, Texas. In the fall of 1930 landowners in Gregg County, Texas, urged petitioner to take oil and gas leases on approximately 3,200 acres of land for the purpose of development of the mineral resources. Petitioner being without funds consulted D. H. Byrd and Jack Frost of Dallas, Texas, operating as a partnership, who agreed to take the responsibility of financing the purchase of the leases. Before taking leases it was orally agreed among the three that Byrd and Frost would have a nine-tenths interest and petitioner a one-tenth interest in the lease acquired. By December 20, 1930, petitioner by his own efforts, acquired at the rate of $2.50 per acre leases carrying *65 an obligation to drill on about 3,200 acres in Gregg County. Petitioner took the leases in the name of D. H. Byrd only; when they were assembled petitioner drew 15-days drafts on himself and attached the drafts to the leases and sent them to the First National Bank, Dallas. Before the end of the 15-day period Byrd and Frost arranged sales of part of these properties to the Magnolia Petroleum Company, and the drafts were paid out of receipts from the Magnolia Petroleum Company. Soon after the 15-day period one-half of a block of leases, hereafter referred to as the West Block, was sold to Gulf Production Company, hereafter referred to as Gulf, and one-fourth was sold to the Humble Oil & Refining Company. From these receipts petitioner and Byrd and Frost acquired additional leases or properties near the original area. Gulf acquired the one-fourth interest of the Humble Oil & Refining Company so that it held a three-fourths interest in the West Block while the petitioner and Byrd and Frost held a one-fourth interest in the West Block. During 1930 and the first two months of 1931 petitioner expended between $1,900 and $2,000 of his own funds for living expenses and in assembling and clearing *66 title to the acquired leases. On March 18, 1931, the partnership of Byrd and Frost transferred to a newly-organized corporation of Byrd-Frost, Inc., all its assets, liabilities and business interests. By May or June of that year Gulf was producing oil on the West Block under an oral agreement between Gulf and Byrd-Frost, Inc. That agreement was not reduced to writing until December 4, 1931. The agreement provided that Byrd-Frost, Inc., held an undivided one-fourth interest in the West Block and was to bear one-fourth of the principal costs of exploration, development, production and treating of oil and gas and the payment or rentals, royalties, taxes and other charges. In addition, Byrd-Frost, Inc. was to bear established percentages of overhead costs. Gulf was to take possession of the entire West Block and have charge of all development, production and sales of gas and oil. Gulf was to maintain a joint account with Byrd-Frost, Inc. and charge to the joint account the above expenses, and Byrd-Frost, Inc. was to have a one-fourth interest in all oil and gas produced on the property. To secure payment of amounts advanced by Gulf, Byrd-Frost, Inc. gave Gulf a lien on all its interest *67 in the leases, production therefrom, and improvements thereon. Neither petitioner's name nor interest was mentioned in the agreement, although petitioner knew of the contract arrangement between Gulf and Byrd-Frost, Inc. and Gulf was informed that petitioner had an interest in the West Block. Prior to August 15, 1931, petitioner's interest in the West Block had not been reduced to writing. D. H. Byrd, prior to acquisition of the leases, had offered to give the petitioner an undivided one-tenth interest therein or give him a separated one-tenth interest in the properties. Petitioner indicated he desired that his one-tenth interest remain undivided and that it be handled along with that of Byrd and Frost. In the summer of 1931 petitioner planned to take a trip and requested D. H. Byrd to assign to him formally his interest, indicating that he desired his interest to remain as an undivided one-tenth with that of Byrd-Frost, Inc. An employee of Byrd-Frost, Inc. advised D. H. Byrd it would be unwise to make the assignment as there was pending litigation contesting Byrd-Frost, Inc.'s interest in the leases. It was decided between Byrd-Frost, Inc., and petitioner that pending settlement *68 of the litigation petitioner would accept a letter which would formally acknowledge his interest, as follows: August 15, 1931. Dear Mr. Happold, "In accordance with our agreement of December 20, 1930, we hand you this letter defining your interest in the West Block. "In consideration of the services you have heretofore rendered in the taking of the block of leases in Gregg County, Texas, known as the Byrd-Frost Gulf & Humble West Block, we agree to give you one-tenth of the net profits received by us from the sale of this block, and one-tenth of all the net earnings accruing to the interest of the Byrd-Frost, Inc., by reason the one-fourth working interest we still have in this block. We agree to keep an accurate account of all money received by us from the Gulf Production, the operator of this lease, and will deposit to your credit. First National Bank at Dallas, Texas, one-tenth of all such money if as and when received by us. Our books will be open at all reasonable times for your inspection. "It is expressly understood, however, that the Willie Holt 229-acre lease is excepted from this agreement, notwithstanding the fact that it is a part of the West Block. If this agreement *69 meets with your approval, please sign the same over the word "accepted' here below. "This agreement shall be binding upon each of the parties hereto, their heirs, successors, assigns, and legal representatives. "Yours truly, "BYRD-FROST, INC. "(Signed) D. H. Byrd "President. "(Signed) Jack Frost, "Vice-President. "(Signed) C. A. Happold "Accepted" About two months after settlement of the litigation which continued approximately 2 1/2 years, petitioner requested D. H. Byrd to give him a formal assignment; D. H. Byrd, however, appeared reluctant to comply with petitioner's request at that time, and petitioner did not then press the matter further. In 1939, as the result of petitioner's divorce, Byrd-Frost, Inc. was made a party to a suit by petitioner's first wife, who claimed among other things a community interest in petitioner's interest in the leases. This suit was settled on April 24, 1939, by the payment of the sum of $3,500 to petitioner's divorced wife in settlement of all her claims to her community property. After this suit the secretary-treasurer of Byrd-Frost, Inc. recommended that petitioner be assigned his interest and on May 18, 1939, Byrd-Frost, Inc. and petitioner *70 executed a written instrument, the pertinent portions of which are as follows: This Contract and Agreement this day made and entered into by and between Byrd-Frost, Inc., a Colorado corporation, with a permit to do business in Texas, First Party, and C. A. Happold, of Dallas County, Texas, Second Party, Witnesseth: That Whereas, Second Party is the owner of an interest in certain leases held in the name of Byrd-Frost, Inc. in the East Texas Field, Gregg County, Texas, known as "Gulf-Byrd-Frost Block", which interest is not of record; and Whereas, it is the desire of both parties that this interest be assigned to Second Party and be recorded in the name of Second Party on the records of Gregg County, Texas; Now, Therefore, it is agreed as follows: First: First Party for and in consideration of One Dollar ($1.00) and other valuable consideration, receipt of which is hereby acknowledged, does hereby bargain, sell, transfer, assign and convey to Second Party an undivided 1/40th interest in and to those certain oil and gas leases and all rights thereunder and the land covered thereby as listed and described in Exhibit 'A' which is hereto attached and made a part *71 hereof as fully and completely as if set out herein. Second: It is agreed by the parties hereto that this assignment is made subject to any and all operating agreements between Byrd-Frost, Inc. and Gulf Oil Corporation in force at this time, and Second Party agrees to all conditions and assumes all obligations contained in said contracts in so far but only in so far as his interest is concerned. Third: For the same consideration, Second Party hereby agrees that should he desire to sell all or any part of the interest conveyed to him by this assignment that First Party here-to shall have a preferential right to purchase same as follows: in the event Second Party shall receive a bona fide offer to purchase said interest or any part thereof, he agrees to notify First Party promptly in writing of such offer, together with the name and address of such prospective purchaser, and First Party shall have an option for a period of fifteen days after the receipt of said notice to purchase said interest, which option must be exercised in writing. Failure of First Party to exercise such option in writing shall be construed as a waiver of said First Party to purchase such interest. *72 Fourth: Second Party further agrees to pay to First Party the sum of One Hundred Twenty-five ($125.00) Dollars per month for various services rendered by First Party in supervision of said properties. Fifth: Second Party hereby agrees that in the event the First Party shall sell its interest in the property covered by this contract and request him to do so, that he will join First Party in such sale and sell his 1/40th interest under the same terms and conditions that First Party sells its interest provided the sale proposed by First Party is in the regular course of business of First Party at the going price for similar properties in the East Texas Field. Sixth: Second Party also hereby grants to First Party an option to purchase his part of the oil produced from the property covered by this contract provided that the price to be paid by Second Party for such oil shall not be less than the price paid from time to time in the East Texas Field for oil of like gravity and quality by the Humble Oil and Refining Company. This option may be exercised by First Party's giving to Second Party thirty days written notice that it desires to purchase said oil. Seventh: *73 This contract is binding on the parties hereto, their heirs, successors and assigns. Eighth: This contract is effective as of May first, 1939. From November, 1930, to May 18, 1939, Byrd-Frost as a partnership and Byrd-Frost, Inc. maintained an account on its books with petitioner. That account was charged with one-tenth of the company's cost of development of the West Block, and was credited with one-tenth of the company's income from the sales of oil and gas leases and royalties. Also during this period petitioner's account was charged with one-tenth the cost of drilling a dry well which the leases obligated Byrd-Frost, Inc. to drill, one-tenth of additional block purchases, one-tenth of royalty purchases, and one-tenth of the overhead costs charged to Byrd-Frost, Inc. by Gulf. Petitioner requested money from Byrd-Frost, Inc. as needed up until about March, 1936. His account with Byrd and Frost showed a substantial credit balance from January 10, 1931, up until February 27, 1932, after which it showed a debit balance for the most part until November, 1935. During the period between January, 1931, and January, 1934, Gulf expended large sums in development of the leases and *74 finally on December 31, 1933, Gulf and Byrd-Frost, Inc. cleared their accounts by Byrd-Frost, Inc.'s paying Gulf for its one-fourth of expenses of development and Gulf's paying Byrd-Frost, Inc. its one-fourth of oil and gas sales to that date. Byrd-Frost, Inc. debited and credited their account with petitioner for one-tenth of these amounts as received and expended. Between February, 1934, and March, 1936, petitioner drew approximately $1,000 per month from Byrd-Frost, Inc., and in March, 1936, petitioner and Byrd-Frost, Inc. cleared their accounts so that instead of petitioner's drawing a round sum each month he was paid each month exactly one-tenth of Byrd-Frost, Inc.'s net income from the oil and gas leases. This practice continued until May, 1939, the date of the above document, after which Gulf accounted directly to petitioner for his one-fortieth of income and expenses and to Byrd-Frost, Inc. for its nine-fortieths of the income and expenses from operation of the West Block. During the years 1936, 1937, 1938, 1939, Byrd-Frost, Inc. filed income tax returns on a cash basis for its fiscal year. In those returns the equipment costs charged by Gulf to Byrd-Frost, Inc., including *75 the equipment cost charged by Byrd-Frost, Inc. to petitioner were treated as the basis for Byrd-Frost, Inc.'s depreciation expense, and Byrd-Frost, Inc. took depletion on all income from Gulf, including that paid petitioner. In addition, the amounts paid petitioner were deducted as an expense of Byrd-Frost, Inc.'s business. Petitioner filed income tax returns for the above years as an individual on a cash basis and took no depreciation or depletion until 1939. In the 1934, 1936, 1937, and 1938 returns petitioner designated the income received from Byrd-Frost, Inc. as income from a profit-sharing contract while in petitioner's 1931, 1932, and 1933 returns the same income was reported as commissions earned and in the 1935 return it was designated as income from an oil contract. All income received from Byrd-Frost, Inc. was treated as community property, the petitioner returning one-half and his wife returning one-half, save between June 26, 1937, and December 22, 1937, when he was unmarried. If petitioner's account with Byrd-Frost, Inc. had been maintained in accordance with petitioner's present theory, the credits and charges to that account and the depletion taken by Byrd-Frost, Inc. *76 on the oil and gas revenues credited to that account for the years 1936, 1937, and 1938 would be as follows: 1936
1937
1938
Oil and gas sales
$35,775.60
$41,450.95
$37,322.14
Expenses
-5,629.78
-5,189.08
-4,543.41
Depreciation
-1,585.77
-1,715.47
-1,842.30
$28,560.05
$34,546.40
$30,936.43
Depletion (27 1/2% of oil and gas sales)
taken by Byrd-Frost, Inc
9,838.29
11,399.01
10,263.59
Balance
$18,721.76
$23,147.39
$20,672.84
Opinion The parties differ on what is basically a factual issue, petitioner contending that his status from the beginning was that of a joint venturer, so that he was entitled to deduct depletion upon the oil payments received and to treat the income as that of a marital community, and so that no substantial change in his rights took place in 1939, when he received and recorded the evidence of his interest; respondent, on the other hand, taking the position that up to 1939 all that petitioner had was a profit-sharing agreement which in 1939 was converted into an interest in property giving rise to taxable gain upon the exchange. For reasons which we are about to state, it is our view that petitioner's ultimate position is sound *77 in the main, but on a ground which he advances as an alternative rather than as the principal contention. It seems to us that the preponderance of the evidence indicates that petitioner was from the beginning a tenant in common in the income-producing property, and that what he received in 1939 was no more than the formal evidence of property rights obtained at the inception of the transaction. On the one hand, there is the testimony of the petitioner that when he undertook to assemble leases, to be financed by the other participants in the transaction, it was orally agreed, as ultimately modified, that he would be granted a one-tenth interest in the leases acquired; and there are the recitals of the document executed in 1939 to the effect that petitioner has been the owner of an interest in the leases which it was the purpose of that document to assign formally and of record. Opposed to this is the language of a letter executed in 1931 purporting to define petitioner's interest and referring to it as a fraction of the net profits received on sale and the net earnings accruing from the working interest; and the treatment accorded by the parties on their tax returns, principally the *78 description by petitioner of the income as proceeding from a profit-sharing agreement, and, although this is by no means clear, the deduction by the other participants, as expense, of the payments made to petitioner. It may be noted in passing that this latter treatment would be equally unsupportable even on respondent's theory since the payments should then have been capitalized. . Respondent having expressly renounced any claim of estoppel, the conduct of the parties is helpful here only in so far as it may contribute evidence of what the contract actually was. See . We are hence presented with a problem in the relative values of various items of evidence. While it may be that petitioner's testimony as to his oral agreement is somewhat weakened by the 1931 letter and the tax treatment, we have been persuaded in arriving at the conclusion previously stated most forcefully by the 1939 assignment. It is not alone the language of that instrument, to which reference has already been made, that has influenced our conclusion, but rather the *79 difficulty of explaining the entire transaction on any other grounds. If something new and valuable, an additional ownership of real substance, was given petitioner for the first time by that instrument, the only contribution made by petitioner in exchange was the service of assembling the leases, performed eight years before. No new development occurred, even on respondent's theory, in 1939. The proportion of the total payments which petitioner received and the computation of their amounts was unchanged. Nothing was altered as a practical matter, save that the payments which petitioner had formerly received through his co-owners were thereafter made to him directly by the operating company, - a result to be expected from the formal recording of the evidence of his interest. What, then, was the reason or occasion for the parties to enter into a new arrangement? As between the conclusion on the one hand that it was the intention to give petitioner gratuitously a valuable interest for no apparent reason, or on the other merely to make formal acknowledgment of rights which petitioner had previously possessed, we see no escape from the latter view. It will be seen that all of this reasoning *80 is acceptable and consistent only on the assumption that what petitioner obtained was a direct participation in the ownership of the property. If from the beginning the arrangement was a joint venture, with the consequence that the leases were no more than partnership property, the 1939 document would have constituted a change in the relationship of the parties and in the title to the property, and it could not be said that thereby it was intended merely to formalize a situation already existing. Such a conclusion is inconsistent with the recitals to which we have already referred that the second party was the owner prior to the execution of that document of an interest in the leases, and the assumption that this was the same interest as that which the document conferred upon him formally. And the remaining characteristics of a joint venture which one would normally expect to find, such as participation in liabilities and a voice in management, do not appear from this record. , modified ; . The *81 foregoing conclusion disposes of the questions relating to depletion, community income, and gain on the 1939 transaction. Petitioner also claims the right to deduct depreciation on his share of the tangible property used in the operation of the leases. Of this, however, we take a different view. Petitioner had no direct investment in this property and the nearest approach that can be made to ascribing a basis to them for depreciation purposes is his argument that a pro rata share of the amount expended for the equipment was charged to his account on the books of his associates. These charges were never paid in cash but were eventually absorbed by credits made to his account as a result of oil payments received from time to time. To the extent, however, that these payments offset the debits by reason of the cost of equipment, that were never reported as income by petitioner. Under these circumstances he acquired no basis either for gain or loss, or for depreciation, which is identically defined by statute, section 114(a), Revenue Acts of 1934, 1936, 1938. The ultimate effect of this manner of treatment is the absence of any showing of an actual cost to petitioner for the equipment in *82 question. It may be that if he had included the payments in his taxable income that would have resulted in conferring a basis in an equivalent amount. But that was not done, and whether the equipment be regarded as received indirectly in compensation for services previously rendered or directly as the proceeds of the ownership of property, it acquired no basis in petitioner's hands in the absence of prior inclusion in taxable income. Commissioner v. Farren (C.C.A., 10th Cir.), 82 Fed. (2d); , affirmed (C.C.A., 5th Cir.), ; [Dec. 10,505]. We are accordingly of the opinion that petitioner's claim for depreciation deductions should be denied. Decision will be entered under Rule 50.